UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

DAVID MOORE,                          ]
                                      ]
          Plaintiff,                  ]          CIVIL ACTION NO.:
                                      ]          CV-04-HS-1194-NE
                                      ]
     v.                               ]
                                      ]
CULLMAN COUNTY COMMISSION,            ]
TYLER RODEN, and                      ]
BRIAN BUEGLER,                        ]
                                      ]
          Defendants.                 ]

**Memorandum of Opinion**

## I.    Introduction

This is a civil action filed, on June 9, 2004, by the Plaintiff, David Moore,

against the Defendants, Cullman County Commission, Tyler Roden, and Brian

Buegler. *Complaint*, at 1. The individual Defendants have been sued only in their

individual capacity. *Id.* The Complaint and Amended Complaint allege three counts,

including violations of the Plaintiff's Eighth and Fourteenth Amendment rights under

42 U.S.C. § 1983 (Count I), Negligence (Count II), and Wantonness (Count III).

Count One is alleged against all Defendants. Counts Two and Three are alleged

against only the individual Defendants.

The case comes before the Court on the Motion for Summary Judgment filed by the Defendants. [Doc. 29].  For the reasons stated herein, the motion will be **GRANTED**.

## II.   Facts

David Moore was arrested on charges of sexual assault, sodomy, and rape, and placed first in the Cullman City Jail and then the Cullman County Jail for holding pending trial.  *Moore Deposition*, at 16, 20.  He stayed about a week in the city jail and about two and one half months in the county jail.  *Id.* at 20.

On this occasion, he was held in side cell number four, as indicated on the floor plan of the jail attached as Exhibit 1 to the Defendant's Brief and Exhibit 1 to this opinion.  *Id.* at 25;  *Defendant's Brief in Support of Summary Judgment*, at Exhibit 1.  He testified in his deposition that he was there "[t]he whole time . . . until I made bond and got out." *Moore Deposition*, at 26.  The Plaintiff also testified that he shared the cell with three other prisoners–one of whom was David Wesley Blair.  *Id.* at 27.  The Plaintiff testified that Blair was in that cell with him the entire two and a half months he was incarcerated.  *Id.* at 28.

During the period of his incarceration the Plaintiff had disagreements with Mr. Blair.  *Id.* at 29.  In his deposition Mr. Moore testified to verbal abusiveness by Mr. Blair towards him but no actual physical violence.  *Id.* at 29-36.  On at least one

occasion, a jailer had to speak with Mr. Blair about his attitude towards Mr. Moore. *Id.*

Moore testified to finding notes among his belongings which threatened his life, but never showed them to anyone else–choosing to destroy the notes instead. *Id.* Moore testified to hearing other prisoners whisper threats to him, but he never told the jailers or Defendant Buegler about these threats. *Id.* at 35-36. During that two and half month period, Moore never complained to the sheriff or Buegler or any of the jailers about being in the cell with Blair or any of the other persons with whom he was incarcerated. *Id.* at 42. He never went to any of the jail personnel or the sheriff and tell them that he was afraid that something might happen to him. *Id.* He never went to them and told them that he felt like anyone was going to do something to him. *Id.* at 42-43.

After he bonded out, the next time that he went to the Cullman County jail was when he was sentenced by the judge on June 10, 2003. *Id.* at 68, 70, 85. After sentencing, he was held in the downstairs portion of the Cullman County jail in a holding cell. Attached to this opinion as Exhibit 2 is a scale diagram of that area. The cell he was held in is labeled "Receiving Cell". *Buegler Deposition*, at 31. After dinner, Mr. Moore was eventually moved to the back bullpen, on the second floor of

the jail. *Moore Deposition.* at 85.  Mr. Blair was in the back bullpen. *Id.*  He did not speak to Blair when he first got there. *Id.* at 86.

The back bullpen is a day room containing a TV, immovable tables, and benches, and measures approximately 40 feet by 11 feet.  The room contains shower basins and two toilets. The room contains no bunks.  The plaintiff was placed in this area with 18 other jail inmates.  Adjacent to the bullpen are five 8 x 14 cells, each housing four inmates.  The five individual cell doors were neither closed nor locked. Indeed, it is undisputed that these cells could not be locked. *Buegler Deposition*, at 86-88; *Roden Deposition*, at 9.  This condition has lasted for at least 10 years prior to the assault made the basis of this complaint.  Inmates were not restricted from roaming freely between cells, or restricted from entry into the bullpen, which also remained unlocked.

Prior to any assault occurring in the back bullpen, the Plaintiff had no idea that that is what the other inmates were going to do. *Moore Deposition.* at 130.  None of the other inmates threatened him or made any other comments towards him. *Id.* When asked if he made any comments to any of the jailers about being afraid or about thinking the other inmates were going to do something bad to him, the Plaintiff testified:

> A    Not really, other than when they took us back to the back bullpen,
> I told her – the officer that took us back, I told her I was in the
> side cell before.

*Id.* at 130-131.  He testified that he told the officer: "that's where Blair is at in the

back bullpen.  And I told her, I said, you know, me and him didn't get along from

before when we was in the side cell." *Id.* at 132.  He did not mention to the jailer any

other inmate other than Blair.  *Id.* at 133.

    During the night of June 10, 2003, and the morning of June 11, 2003, the

Plaintiff was attacked by a number of inmates in the back bullpen.  *Complaint*, at ¶

15.  The Plaintiff contends that this occurred "[s]ometime after 11:00 pm." *Plaintiff's*

*Brief*, at 2.  The assault included physical beating, dousing with cleaning chemicals,

and insertion of a plunger handle into the Plaintiff's rectum.  *Moore Deposition*, at

91-129.  The Plaintiff testified that Blair did not actually participate in the physical

assault against him.  *Id.* at 132.  The Plaintiff testified that he had no idea that any of

the inmates were going to jump or beat him.  *Id.* at 133.

    When asked what the Defendants should have done differently to protect him

from the assault, the Plaintiff testified that the Defendants should have placed him in

a side cell due to the nature of the charge for which he was convicted.  *Id.* at 165-167.

Also, the Plaintiff contends that the Defendants should have had video monitors and

microphones in place to alert officers of a problem.  *Id.* at 167.  Moore has no

information or knowledge as to why the Defendants chose to put him in the bullpen as opposed to a side cell.  *Id.* at 166.

Mr. Buegler is the Warden at the Cullman County Jail.  *Buegler Deposition*, at 9.  He is also known as "jail administrator" and "head jailer".  *Id.*  He coordinates the jail with the Department of Corrections in terms of periodic inspections.  *Id.* at 12. He testified that the jail personnel create a daily report which he maintains in his file. *Id.* at 15.  Normally it is the shift supervisor's job to create this report.  *Id.*

It is undisputed that at the time of the incident made the basis of this Complaint, there was no audio or video monitoring equipment at the jail.  *Id.* at 23.

Mr. Buegler testified that, in June of 2003, the county commission had funded positions for the jail totaling fifteen positions under a classification known as correctional deputies.  The commission funded positions and the sheriff designated those positions as jailers.  *Id.* at 39.  When asked about the staffing pattern at the jail, Buegler testified as follows:

> Q.    All right.  Tell me what the staffing pattern was on the first shift in June of 2003 and what was considered the first shift in 2003.
>
> A.    8:00 a.m. to 4:00 p.m.
>
> Q.    And what was the staffing in the jail?
>
> A.    I would have to know the day of the week.

Q.    Tell me what the differences would be.

A.    Well, normally, day shift Monday through Friday is extremely
      busy because we've got court.

Q.    Yes, sir.

A.    We've got medical call.  Those are the biggest issues there.  So
      we're dealing with that and releasing people from the weekend or
      accepting people from the court, taking them to court.  And on a
      typical day like that, when all of that occurs at the same time, it's
      pretty busy.  We're spread pretty thin.

Q.    How many people are typically assigned Monday through Friday,
      8:00 to 4:00?

A.    Back then or today?

Q.    In June of 2003.

A.    Three.

Q.    Second shift would be 4:00 to –

A.    4:00 to midnight.

Q.    4:00 to midnight?  How many staff Monday through Friday?

A.    Two. Two.

Q.    Okay.  Third shift, 12:00 to 8:00?

A.    Yes.

Q.    Monday through Friday, how many staff?

A.    Two.

Q.      Weekends, would the staffing pattern be different?

A.      Yes.

Q.      What would weekends be?   Weekend, do you consider from Friday at 6:00 until first shift Monday morning?

A.      Yes.

Q.      So what would the staffing pattern be?

A.      The Friday and Saturday nights, second shift would probably have more manpower then the – we try to have more than two. That's where our part-timers would come in.  Third shift, let's see, Saturday morning, which is the Friday night, Saturday morning, we would try to have additional people on that shift, and the shift early Sunday morning and midnight to 8:00.

*Id.* at 42-44. Buegler testified that there were probably only two persons working the evening the Plaintiff was attacked.  *Id.* at 44.  He was the person responsible for setting the staffing pattern at the jail. *Id.* at 44-45.  He and Sheriff Roden would interview people for correctional deputy positions, and Roden would make the ultimate decision.  *Id.* at 49-50.

Buegler testified that it was practice for jail staff to inspect all the jail areas in intervals ranging from fifteen, to twenty, to thirty, to forty-five minutes.  *Id.* at 57-58. The intervals between these inspections varied so that they could not be predicted by inmates.  *Id.* at 58.  A daily log sheet was used to document inspections.  *Id.* at 58.

8

Jailers also make contact with inmates during medical call, food service, and anytime there is inmate movement. *Id.* at 61. He testified that the two officers performing the inspections would also, at the very least, visually inspect each cell. *Id.* at 66.

Buegler also testified that in June of 2003, the cells in the bullpen areas were not checked every 15 minutes, every 30 minutes, or even every hour. *Id.* at 67. That was one of the reasons he went to the Sheriff and asked for more manpower at the jail. *Id.* at 68-69. When asked why that was necessary, he testified: "When all of this activity is going on in the jail, there's areas of the jail that are left unattended, and I felt like those areas needed to be attended to." *Id.* at 69. He testified to there having been previous instances of "assaultive behavior" that prompted the need to have additional staff. *Id.* at 69. He had made that information known to the Sheriff, and, to his knowledge, the Sheriff made that information known to the Commission. *Id.* at 69. Sometime before June of 2003, he received two or three part time staff people. *Id.* at 72.

One of the officers who checked the cell the night of the attack, Christopher Westmoreland, testified in his deposition that during checks he physically would go into the bullpen area. *Westmoreland Deposition*, at 68. He stated that he would physically go into each cell and the day room. *Id.* at 68-69. He would walk around in the day room. *Id.* at 69. He also would check each bullpen. *Id.* at 69-70.

9

Accordingly to the log sheet, the cells in the bullpen were checked at 12:50, 1:40, 2:10, 2:45, 3:55, and at roll call at 4:50 a.m. when breakfast was being served. *Defendant's Brief*, at Exhibit 2. Deputy Westmoreland also testified that the bullpen was entered by a guard at 3:15 a.m. when a prisoner was moved. *Westmoreland Deposition*, at 83-84. This is also reflected on the log sheet. Westmoreland also testified to having walked the catwalk over the bull pen at 1:40 and 2:10 a.m. *Id.* at 84-85.

When asked about whether he saw Mr. Moore that night, the following exchange took place:

Q.    Do you know David Moore?

A.    Yeah, he had been in our facility prior to then.

Q.    And you didn't know he was back there that day?

A.    No.

Q.    And you never saw him back there that night?

A.    No, I had not seen him until the morning when I was calling roll and he come to the door.

Q.    So you had known him because he had been up there for two months, right?

A.    Yeah, he has been there the time before then, yes.

Q.    Did you know him in the community generally?

A.   No.

Q.   I know the population changes from day to day, but for the couple of months or so that he was up there, he was somebody that was familiar to you?

A.   Uh-huh.

Q.   And so until you saw him at five in the morning, then you didn't even know he was there?

A.   No.

Q.   Had you walked both bullpens, inside both bullpens, you would have known David Moore was there wouldn't you?

* * *

A.   If he would have made himself aware that I was – that he was there.   At that time if somebody was asleep, covered up or whatever, we did not wake them up.

*Id.* at 81-82.

The Plaintiff, when asked if any guards came in while the assault was going on answered: "I didn't see none." *Moore Deposition*, at 125.  He stated that other than what he heard his attackers say, he had no knowledge of whether a guard came through or not.  *Id.*  His attackers told him twice during his attack that a guard came to the door.  *Id.*  He stated that he did not know if that was true or not.  *Id.* When asked about whether he tried to contact anyone during the assault, the following exchange took place:

Q.   Did you at any point try to go over and talk to the trustees that were outside the bullpen?

A.   No.

Q.   Why not?

A.   Because they told me when they had me back before, they said if I tried to either holler at the trustees or get to the front door to get them up there, that they would kill me before I get to that front up there.

*Id.* at 127.[1]

The Second Shift Supervisor made the decision to put the Plaintiff in the back bullpen. *Buegler Deposition*, at 100-101. The back bullpen was designated for state sentenced inmates. *Id.* at 101. It was Buegler's practice to put the most serious offenders in the two front side cells on the front most corridor of the jail upstairs. *Id.* at 102.

Tyler Roden is the Sheriff of Cullman County, and is the final decision maker regarding operations of the jail. *Roden Deposition*, at 8. Roden decided to leave the doors open in the bullpen area due to concerns that in an emergency situation, staffers would not be able to open them in a timely manner. *Id.* at 9. Roden was also the final

---

[1]Although the question specifically was directed at trustees, the Plaintiff uses this answer for the general allegation in his brief that "[t]he Plaintiff was instructed by his attackers to remain silent, and to not holler or the attackers would kill him." *Plaintiff's Brief*, at 2. The quote does not support the broader interpretation that the Plaintiff obviously means to Court to glean from it–that, whether or not guards walked through the bullpen and checked the cells, the Plaintiff could not have called out to them.

12

decision maker as to staffing of the jail and the determination that there would be two individuals on the second and third shift. *Id.* at 9-10.

Prior to June, 2003, Roden told County Commission about the need for more staffing. He recalled from January, 1995, through June, 2003, there were several occasions when he asked for an increase in staff and that sometimes his requests were granted and sometimes they were not. *Id.* at 12. Prior to his request in June of 2003, Roden had not made a formal request to the county commission regarding the installation of audio and video communication devices in the jail cells. *Id.* at 16.

Roden recalled having communications regarding monitoring equipment with the commission after the settlement of the *McKenzie* case. *Id.* at 17. After June of 2003, Roden made the decision to use discretionary funds to install audio and visual monitoring equipment. *Id.* at 17. Roden denied ever hearing any information regarding threats made against David Moore during Moore's stay at the Cullman County Jail. *Id.* at 22.

It is undisputed that the Cullman County Jail is an old overcrowded facility, where inmates must sleep in hallways, corridors and day rooms, including the back bullpen. Inmates are often given mattresses and told to find space on the floor. It is also undisputed that these conditions were known to Buegler and Roden, and that the

13

jail has been overcrowded for at least the last 15 years.  Inmates continued to be placed in the jail despite the overcrowding.

At the time of the assault, cleaning chemicals and solvents, mops, brooms, and plungers were kept unsecured in the shower area of the bullpen.  Inmates had unsupervised access to these materials at any time.  Nothing was done to limit these inmates' access to these chemicals and materials.

No jail staff was assigned in the area where the assault occurred.  There were no video cameras or audio boxes.  Roden testified that he knew that the risk to inmates was exacerbated by the lack of such equipment.  *Roden Deposition*, at 15. Although there was no formal classification system for inmates in place, Buegler testified that an informal system existed.

Fights and assaults occurred at the jail as often as 2 to 3 per month.  Roden testified that he knew that the risk of fights increased as the population of the jail increased.  The Plaintiff testified that during his first incarceration there were 2 to 3 fights per day, and 2 or 3 stabbings while he was there.  *Moore Deposition*, at 50-51.

The conditions at the jail were the subject of previous litigation in *McKenzie v. Spear, et al.*, CV-00-S-1434-NE (N.D. Ala.).  The case involved an assault on an inmate in the back bullpen area of the Cullman County Jail.  The parties entered into a settlement agreement which provided for: 1) construction of a new jail, 2) use of the

existing jail provided the facility adequately assured the health, safety and welfare of the inmates, and 3) implementation of "a communication procedure for use by Jail inmates which will allow inmates an opportunity to timely notify jail officials of emergencies and provide jail official an opportunity to respond." *See Exhibit F to Plaintiff's Brief.* Although the settlement discusses video and audio monitoring, it does not require them.

## III.    SUMMARY JUDGMENT STANDARD

> In conducting [a summary judgment analysis], [the Court must] view all evidence and factual inferences in the light most favorable to the nonmoving party. *Id.* Summary judgment is proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment. *Id.*

*Lofton v. Secretary of Dept. of Children and Family Services,* 358 F.3d 804, 809 (11th Cir. 2004).

## IV.    ANALYSIS

### A.    Count One [42 U.S.C. § 1983]

The Plaintiff's Section 1983 suit is based upon an allegation that "[a]s a result of the defendants' actions and conduct described herein, the Plaintiff was caused to

suffer the damages set forth herein in violation of his protections afforded by the eighth and fourteenth amendments to the Constitution of the United States."

*Amended Complaint*, at 5.

The law in this area is clear.

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 828, 114 S.Ct. 1970, 1974, 128 L.Ed.2d 811 (1994); see *Helling v. McKinney,* 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). " '[P]rison officials have a duty ... to protect prisoners from violence at the hands of other prisoners.' " *Farmer,* 511 U.S. at 833, 114 S.Ct. at 1976. (quotations and citations omitted). "It is not, however, every injury suffered by one inmate at the hands of another that translates into a constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834, 114 S.Ct. at 1977.

"An Eighth Amendment violation will occur when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not 'respond[] reasonably to the risk'...." *Marsh v. Butler County, Ala.,* 268 F.3d 1014, 1028 (11th Cir.2001)(en banc), *quoting Farmer,* 511 U.S. at 844, 114 S.Ct. at 1982-83. "[T]o survive summary judgment on his section 1983, Eighth Amendment claim, [Plaintiff] was required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Hale v. Tallapoosa County,* 50 F.3d 1579, 1582 (11th Cir.1995).

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003).  Accordingly, for the Plaintiff's claims to proceed, he must show sufficient evidence of (1) a substantial risk of serious harm; (2) that the defendants were deliberately indifferent to that risk; and (3) causation.

### 1.    Substantial Risk of Serious Harm

The Plaintiff points to the combination of the following conditions as evidence of a substantial risk of serious harm: 1) overcrowding; 2) an inability to lock cells; 3) the allowed practice of inmates roaming freely between cells and bullpen; 4) unfettered access to chemicals, solvents, and broom and plunger handles; 5) an inability to audibly or visually monitor or supervise inmates in the cells and bullpen; 6) lack of any means of communication between inmates and staff; 7) no classification system to segregate inmates; 8) inadequate staffing; and 9) a history of fights and assaults that the Plaintiff characterizes as common.  During oral argument, Plaintiff's counsel stated that it was the *combination* of these conditions that creates the threat.

The Defendant counters first that the knowledge of these conditions by Buegler and Roden amount to only a "*generalized awareness* of risk inherent in any jail or prison situation where criminals are housed in confinement."  *Defendant's Brief*, at 11.[2]  Each side argues the case is similar in fact to Eleventh Circuit precedent. Defendants argue the case is more similar to the facts in *Carter*, while Plaintiff argues

---

[2]Defendants also argue that the intervening act of the prisoners was the *cause* of Plaintiff's injuries, not the conditions of the jail.  Although the Defendants argue this point under the first prong of the *Carter* test, it more appropriately falls under the causation prong and will not be addressed at this time.

the facts are more similar to those in *Marsh v. Butler County*, 268 F.3d 1014 (11th Cir. 2001).  The facts of the two cases warrant review here.

### a.   *Carter v. Galloway*, 352 F.3d 1346 (11th Cir. 2003).

In *Carter*, the Plaintiff had been incarcerated at Hays State Prison ("Hays") since 1991, serving a life sentence. Hays classified Plaintiff as a medium-security, Level 1 inmate, with no history of violence while in the prison.  *Carter*, 352 F.3d at 1347.  Hays used a security classification system, assigning inmates as either trusty, minimum, medium, close, or maximum based on a wide range of relevant factors.  *Id.* at n. 2.  Hays also used a behavior management system, classifying inmates for certain housing assignment purposes within the general prison population ranging from Level 1 to Level 5--Level 1 being the best-behaved, with Level 5 being the worst-behaved.  *Id.*

Plaintiff had been assigned to work in the prison library, having had access to the library's computer.  *Id.* at 1347. As a result of an investigation concerning improper use of the library's computer, the Plaintiff was moved to "involuntary administrative segregation."  *Id.*  Plaintiff was assigned to a double-bunked cell that was currently being occupied by Inmate Barnes.  *Id.* at 1348.  Inmate Barnes was assigned to isolation and classified as a close-security, Level 5 inmate. *Id.*  Before entering the cell, Plaintiff noticed that Inmate Barnes was pending reclassification to

maximum-security status.  *Id.*  At that time, Plaintiff asked not to be placed in a room with Inmate Barnes, but his escort officer denied this request.  *Id.*

After Plaintiff's placement with Inmate Barnes, Inmate Barnes notified Plaintiff of an intention to fake a hanging, part of Inmate Barnes's plan for being transferred to the medical prison.  *Id.*  Prior to becoming Plaintiff's cellmate, Inmate Barnes had a record of violence while in incarceration, but he had never previously assaulted a cellmate. Defendants and other Hays officers clearly knew that Inmate Barnes had caused many problems during his prison time.  *Id.* at n. 6.  Plaintiff refused to assist Inmate Barnes's plans, and Inmate Barnes informed Plaintiff that Plaintiff would help "one way or another."  *Id.* at 1348.  Plaintiff interpreted this statement as having been a verbal threat, and this statement is the only evidence Plaintiff referenced as such a threat.  *Id.*  Inmate Barnes also paced the cell like "a caged animal," threatening correctional officers and orderlies--generally acting in a disorderly manner.  *Id.*

Sometime between May 6th through 10th, 1999, Plaintiff notified Defendant Galloway that Barnes was acting crazy and planned on faking a hanging. *Id.*  Plaintiff also told Galloway about Inmate Barnes's comment that Plaintiff would help in the faked hanging "one way or another."  *Id.*  Plaintiff also put his request to move in writing, in conjunction with a statement Defendant Galloway asked Plaintiff to write about the library computer investigation.  *Id.* at n. 7.

19

On May 10, 1999, Plaintiff appeared before Defendant Upton for an administrative segregation hearing, where Plaintiff, for the most part, told Upton the same information about Barnes that Plaintiff had previously given to Defendant Galloway. *Id.* Defendant Upton told Plaintiff that no removal would not be in order until the library computer investigation came to an end. *Id.* Defendant Upton held the power to move Plaintiff to another dorm room, as Defendant Upton had taken this action on previous occasions with other inmates.

On May 16, 1999, Inmate Barnes assaulted Plaintiff, stabbing Plaintiff in the stomach with a "shank" (an inmate-made weapon). *Id.* After the Plaintiff filed suit. the Eleventh Circuit upheld the District Court's grant of Summary Judgment for Deendants.  Specifically, the Court wrote:

> Plaintiff asserts that both Defendants were deliberately indifferent by allowing Plaintiff to remain in the cell, allegedly leaving Plaintiff exposed to a substantial risk of serious harm from Inmate Barnes. To be deliberately indifferent, Defendants must have been "subjectively aware of the substantial risk of serious harm in order to have had a ' "sufficiently culpable state of mind." ' " *Farmer,* 511 U.S. at 834-38, 114 S.Ct. at 1977-80; *Wilson v. Seiter,* 501 U.S. 294, 299, 111 S.Ct. 2321, 2324-25, 115 L.Ed.2d 271 (1991). The district court found a lack of sufficient evidence from the summary judgment record to establish Defendants' subjective awareness. We agree.

*Id*. at 1349.  The opinion does not address the standard by which to judge "substantial risk of serious harm," nor the party upon whom the burden lies to show, or disprove, same.

   **b.**   ***Marsh v. Butler County*, 268 F.3d 1014 (11th Cir. 2001).**

   The Eleventh Circuit summarized the facts of the *Marsh* case as follows:

   The Jail was an old building that had become extremely dilapidated by the summer of 1996. Inmates were able to obtain makeshift weapons by cannibalizing parts of the decaying building. Lack of adequate monitoring of the inmates allowed inmate activities to go mostly unchecked. Locks to the doors of the inmates' cells did not work, resulting in the inability of the guards to lock down the prisoners. Because prisoners were never locked down, jailers were afraid to conduct visual inspections of inmate cells on the second floor; most of the inmate population was kept on the second floor. No visual or audio surveillance system was in place on the second floor, nor, did prisoners have means to contact guards other than by screaming or banging on the walls. Jailers never conducted prisoner headcounts.

   Often, only one jailer was on duty at the Jail at a time. This single jailer was responsible for controlling the entire inmate population, administering inmate intake and release, controlling the gate and fence surrounding the Jail, supervising visitation and outdoor exercise, handling mail, coordinating food service, dispensing medication, supervising trustees, answering the Jail telephone, and (at times) answering calls to the Butler County Sheriff's Department and operating the dispatch radio. Because the Jail was understaffed, inmate trustees were given many responsibilities for taking care of other inmates and maintaining the operation of the Jail.

   In August 1995, the jail inspector for the Alabama Department of Corrections recommended that all Butler County jailers be trained in jail-management seminars. By the time of the incidents underlying the

complaint, few jailers had been so trained. Written procedures did not govern the Jail's operations.

Inmates entering the Jail were not screened for mental impairments or for whether they had conflicts with other inmates in the Jail. No system of classification existed at the Jail: pretrial detainees were housed with convicted inmates, nonviolent offenders with violent offenders, juveniles with adults, and mentally ill persons with those in good mental health. Never were prisoners disciplined or segregated for assaulting other inmates, destroying jail property, or threatening jailers. The Jail contained four eight-person cells, one four-person cell, trustee cells, two holding cells, one isolation cell and a cell for female inmates; but sometimes more than 50 inmates were imprisoned at the Jail.

Jail Administrator Thelma Teague ("Teague") told the Sheriff several times that the Jail needed more staff. In February 1996, the jail inspector for the Alabama Department of Corrections informed Defendants that the Jail was not reasonably secure. Defendants also received many complaints and requests for assistance from prisoners. A letter from prisoner-rights advocates told Defendants that the Jail conditions posed "an immediate and serious threat to the safety of the inmates" and made inmates "highly vulnerable to assault by other inmates."

On 2 July 1996, four inmates assaulted Joe Marsh in his cell. He was struck in the head with a metal pipe, beaten for several minutes, and cut with a screwdriver. During the assault other inmates yelled and banged on the walls attempting to get the attention of jailers. No jailer came upstairs until 10 to 15 minutes after the assault ended. Marsh suffered lacerations across his forehead, on the back of his head and on his back. The bone above his eyebrow was broken. Marsh was taken to a hospital where he received medical treatment for his injuries. His left eye now droops, and he has nerve damage in his forehead as a result of the assault. He continues to suffer from frequent headaches and nightmares.

The four attackers were never disciplined for the assault on Marsh. Two days later (and after the attack on Owens) one of the four attackers

discharged a fire extinguisher into Marsh's cell where he was resting, nearly suffocating him.

Owens, a paranoid schizophrenic, was a pretrial detainee who was placed in the general population at the Jail. On 3 July 1996, the same four inmates who assaulted Marsh attacked Owens.

Owens was attacked in the day room on the second floor. He was hit in the head with a metal pipe and hit with a watercooler. His head was smashed into a table, and he was kicked, stomped, stabbed and beaten for 30 minutes to an hour. Other inmates called for the jailer to assist Owens. During the assault, the attackers returned to their cells when they suspected a jailer was on the way. When the attackers realized that no help for their victim was coming, they returned to the day room to continue the assault.

When the assault started, only one jailer was on duty. When he heard the cries for help he called the Greenville City Police. When the police arrived, they refused to go onto the second floor. The jailer called the Sheriff and Jail Administrator Teague, but both refused to come to the Jail. Chief Deputy Hartley ("Hartley") was called and did come to the Jail.

Twenty minutes after the assault ended, Hartley walked upstairs and brought Owens downstairs. Owens was taken to a hospital shortly after midnight on 4 July. His injuries were treated. Owens was discharged from the hospital to the care of the Butler County Sheriff's Department. Two deputies signed a discharge sheet which instructed them to monitor Owens's level of consciousness, pupils, vision, and coordination, and to call the hospital immediately if a change occurred.

Back at the Jail, Hartley instructed Owens to sign his own bond, pursuant to Defendants' policy and custom of releasing sick or injured inmates. Hartley then drove Owens to a motel near the I-65 interstate highway and released him. Owens's clothes were bloody, and he was in his bare feet. The clerks at the motel refused to rent him a room and called the police. The police officer who responded to the call followed Owens as he wandered across the I-65 overpass and then ordered the

clerk at another motel to rent Owens a room.

Owens awoke the next day in terrible pain and called his grandmother's house. His sisters came to the motel where Owens had spent the night. An ambulance was called, and Owens returned to the hospital where a doctor prescribed pain medication. Because of the assault at the Jail, Owens still experiences pain and limited mobility in his right shoulder and uncontrollable shaking in his right arm.

*Marsh v. Butler County, Ala.*,  268 F.3d 1014, 1024 -1026 (11th Cir. 2001).

Its ultimate holding aside, as to the "substantial risk of serious harm" prong, the Court held:

We accept that conditions in a jail facility that allow prisoners ready access to weapons, fail to provide an ability to lock down inmates, and fail to allow for surveillance of inmates pose a substantial risk of serious harm to inmates. In addition, Plaintiffs' allegations that the County received many reports of the conditions but took no remedial measures is sufficient to allege deliberate indifference to the substantial risk of serious harm faced by inmates in the Jail.

*Id.*

### d.    Analysis

It is important to note however, that the motion the *Marsh* case dealt with was a Motion to Dismiss.  Therefore, this Court must presume that the Circuit Court looked only to the allegations of the complaint to determine whether a substantial risk of serious harm was alleged by the Plaintiff.  There is no indication in the opinion otherwise.  What is clear, however, is that the opinion does not address, in the

Summary Judgment context, the standard by which to judge "substantial risk of serious harm," nor the party upon whom the burden lies to show, or disprove, same.

The Plaintiff cites no law on the standard for determining this issue. The law cited by the Defendant does not go towards determining *whether* there is a substantial risk, which is the initial consideration the Court must undertake. The *Marsh* Court made that determination, but the facts in this case do not exactly mirror *Marsh*. Here, as was the allegation in *Marsh*, there is substantial evidence that prisoners had ready access to the weapons used against the Plaintiff, and that the jail did not, and could not, lock down inmates. However, even when viewed in the light most favorable to the Plaintiff, there is not substantial evidence that the County failed to allow for surveillance of inmates or that the County received any reports of the conditions but took no remedial measures.

In addition to the allegations deemed sufficient in the *Marsh* case, here, it is undisputed that the jail is seriously overcrowded. Also, there was no formal classification system to segregate inmates (although Defendants testified that an informal one existed), the inmates could roam freely between cells and the back bullpen, and there was a history of fights and assaults that the Plaintiff characterizes as occurring 2-3 times a day. The jail was also understaffed to properly protect inmates.

The evidence, when viewed in the light most favorable to the Plaintiff *does not* establish an inability to audibly or visually monitor or supervise inmates in the cells and bullpen. The evidence is undisputed that it was jail policy to perform regular checks of the bullpen and cell areas and that same were done during the incident in question. In addition, walkthroughs from the catwalk above the bullpen area were done at least twice that night. At any of these times an inmate in the jail could have contacted a jailer. Accordingly, the undisputed evidence *does not* establish lack of a means of communication between inmates and staff. When viewed in the light most favorable to the Plaintiff, the evidence only establishes the inability to *constantly* monitor inmates, and to provide inmates with a *constant* means of communicating with jailers.

Still, after reviewing this evidence, the Court is convinced that the conditions for which there is substantial evidence, when taken as a whole, amount to a substantial risk of serious harm.

### 3.    Deliberate Indifference

To be deliberately indifferent, Defendants must have been "subjectively aware of the substantial risk of serious harm in order to have had a ' "sufficiently culpable state of mind." ' " *Farmer,* 511 U.S. at 834-38, 114 S.Ct. at 1977-80; *Wilson v. Seiter,* 501 U.S. 294, 299, 111 S.Ct. 2321, 2324-25, 115 L.Ed.2d 271 (1991).

\* \* \*

Even assuming the existence of a serious risk of harm and legal causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists--and the prison official must also "draw that inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979.

* * *

[A] generalized awareness of risk in these circumstances does not satisfy the subjective awareness requirement.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003).

Even recognizing a substantial threat, as stated above, the Court finds the *Carter* case more instructive than *Marsh*. In *Carter*, the Eleventh Circuit found no deliberate indifference despite the fact that: 1) Plaintiff had specifically asked not to placed in a room with his attacker; 2) the attacker had arguably made threats against the Plaintiff which the Plaintiff conveyed to Defendants on three occasions (at least once in writing); 3) the attacker acted disorderly, often threatening officers; and 4) the attacker had a record of violence while incarcerated. Still, despite the facts, the court held that the Defendants' refusal to move the Plaintiff did not amount to deliberate indifference because the Defendants' knowledge only amounted to a "generalized awareness of risk" which did not satisfy the subjective awareness requirement.

Here, it is undisputed that the Defendants had knowledge of the combined factors, identified above, which amount to a substantial threat of serious harm. However, this amounts to a mere *generalized awareness*.  Indeed, the level of awareness does not even rise to the level of that in *Carter*.  In the instant case, the Plaintiff testified to no specific threat against him, and no fear of injury from any of the inmates with whom he was being jailed.  The Plaintiff did not identify a threat to his safety either in his first or second incarceration.  At no time did the Plaintiff ask to be moved or segregated.  Clearly, not even the Plaintiff could have drawn an inference of a substantial risk of harm, much less the jail official.

Under the facts of this case, the deliberate indifference prong of the test is not satisfied.  Accordingly, Summary Judgment should be **GRANTED** on the Plaintiff's Section 1983 claims as to all Defendants.

### 4.    Causation

Even if deliberate indifference could be shown, the undisputed testimony of Westmoreland and the jail logs show that several times during the attack a guard was *actually present* in the bullpen and cell area.  Moore never availed himself of the assistance of the guards.  Even when first confronted by a guard the next morning, Moore refused to admit that he had been in an altercation.  It is Moore's lack of contact with the guards, not the conditions complained of by the Plaintiff, which led

to his continued assault.  Therefore it seems that the causation prong is also lacking in this case.

## B.     Count One – Qualified Immunity and the Individual Defendants

The individual Defendants should be dismissed based on not only the above analysis, but also the doctrine of qualified immunity.

> To receive qualified immunity, "the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Id.* (internal quotation marks omitted). . . . "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Id.*

*Id.*  Once the burden has shifted

> [t]he Supreme Court has set forth a two-part test for the qualified immunity analysis. "The threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 2513, 153 L.Ed.2d 666 (2002) (citing  *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151.

*Wood*, 323 F.3d at 877 -878.

> However, "[i]f a constitutional right would have been violated under the plaintiff's version of the facts, 'the next, sequential step is to ask whether the right was clearly established.' " *Vinyard,* 311 F.3d at 1346 (quoting *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151).

*Id.* at 878.

It is undisputed that the Defendants were acting within the scope of their discretionary authority.  Thus, the burden shifts to Plaintiff to establish that the Plaintiff's allegations, if true, establish a Constitutional violation.  As noted above, the Plaintiff cannot make this showing because he cannot show deliberate indifference.  Accordingly, the Defendants are entitled to qualified immunity.

If the deliberate indifference prong had been satisfied, then the Plaintiff would have carried his burden of showing a Constitutional violation.  The question would then be whether the right which the Plaintiff complains was violated was clearly established.  The Plaintiff points to case law establishing that jail conditions must not violate the Eighth Amendment as the "clearly established law".  However, the Court need not evaluate whether that law applies to this particular case, because, even if the law was clearly established, the Defendant may still be entitled to qualified immunity.

As the Court in *Marsh* noted:

> Given that a substantial risk of serious harm was present, an Eighth-Amendment defendant might still be entitled to qualified immunity on a different basis: if he responded in a way that was arguably reasonable – in the light of the clearly established preexisting law – to the substantial risk of serious harm to inmates.

*Marsh*, 268 F.3d at 1034.  In this case, it is undisputed that, since the *McKenzie* settlement, the individual Defendants participated in reasonable actions to continue

30

using the jail.  They provided for regular, physical, personal inspections of the jail by jailers, and they began building a new jail.   They also recognized their understaffing and continued to ask for more jailers.  Because the Defendants' actions were arguably reasonable, they are entitled to the defense of qualified immunity.

The Motion for Summary Judgment should be **GRANTED** as to Defendants Buegler and Roden as to Count One on the basis of qualified immunity.

### C.    Counts Two and Three

The Plaintiff acknowledges that State Actor Immunity and Law Enforcement Immunity apply to protect the Individual Defendants unless these Defendants acted willfully and/or in bad faith.  Not only has it not been previously pled that these Defendants acted willfully and/or in bad faith, the evidence, even when viewed in the light most favorable to the Plaintiff, does not establish same.  The Motion for Summary Judgment as to Counts Two and Three is due to be **GRANTED**.

## V.    CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment will be **GRANTED**, and **JUDGMENT** will be **ENTERED** in favor of the Defendants.

**DONE** this 11th day of May, 2005.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

31